IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RICKIE E. WILDER,
 Plaintiff,

vs.         Case No.: 3:17cv239/RV/EMT

ARAMARK, et al.,
 Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Rickie E. Wilder ("Wilder"), a pre-trial detainee housed at the Escambia County Jail, is proceeding pro se and in forma pauperis in this civil rights action. Presently before the court is Wilder's Complaint (ECF No. 1) and "Emergency Temporary Injunction" (ECF No. 5). Defendant Allison Burgess filed a motion to dismiss the complaint (ECF No. 12), but has not responded to Wilder's motion for preliminary injunction. Wilder responded in opposition to Defendant Burgess' motion to dismiss (ECF No. 15). The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(E); *see also* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

I.  BACKGROUND

Wilder commenced this civil rights case on April 12, 2017, by filing a Complaint and a motion to proceed in forma pauperis (ECF No. 1 at 12; ECF No. 2).[1]  Wilder names three Defendants:  (1) Allison Burgess, an Advanced Registered Nurse Practitioner ("ARNP") at the Escambia County Jail ("Jail"); (2) J. Hannah, the director/supervisor of food service at the Jail; and (3) Aramark, the contracted food service provider for the Jail (ECF No. 1 at 1, 2).  Wilder claims that Defendants have subjected him to cruel and unusual punishment and violated his rights to due process and equal protection by failing to provide adequate medical treatment and failing to comply with his medically prescribed diet, in violation of the Fourth, Sixth, Eighth, and Fourteenth Amendments (*id.* at 6–12).  As relief, Wilder seeks an injunction "removing" ARNP Burgess from medical practice and "removing" Aramark and Mr. Hannah from the Jail (*id.*).  Wilder also seeks $300,000.00 in monetary damages (*id.*).

On May 22, 2017, Defendant Burgess filed a motion to dismiss, contending Wilder's claims are subject to dismissal for failure to demonstrate exhaustion of administrative remedies and failure to state a claim upon which relief can be granted,

---

[1] The page numbers referenced in this Report and Recommendation reflect the page numbers automatically assigned by the court's electronic docketing system rather than those of the original documents.

pursuant to Rule 12(b)(6) (ECF No. 12).[2]  Wilder filed a 38-page response, setting forth additional factual allegations and arguing that he satisfied the exhaustion requirement and the standard for stating a claim under the Eighth and Fourteenth Amendments (ECF No. 15).  Wilder attached copies of administrative grievances and sick call requests in support of his exhaustion argument (*id.*).

## II.     STANDARD OF REVIEW

Motions to dismiss for failure to state a claim are governed by Rule 12(b)(6). In applying that rule, the allegations of the complaint are taken as true and are construed in the light most favorable to the plaintiff.  *See* Davis v. Monroe Cnty. Bd. of Educ., 120 F.3d 1390, 1393 (11th Cir. 1997).  "Pro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed."  Boxer X v. Harris, 437 F.3d 1107, 1110 (11th Cir. 2006).  The court may consider documents attached to a complaint or incorporated into the complaint by reference, and matters of which a court may take judicial notice.  *See* Tellabs, Inc. v.

---

[2] The court did not authorize service of process, as required under the court's Local Rules. *See* N.D. Fla. Loc. R. 4.1(A) ("A party who is not represented by an attorney and who has moved or intends to move for leave to proceed in forma pauperis must not serve process—and must not request a waiver of service under Federal Rule of Civil Procedure 4(d)(1)—until the Court enters an order authorizing it.").  Additionally, Wilder did not serve sufficient process, in accordance with Rule 4 of the Federal Rules of Civil Procedure, upon any Defendant.  Wilder simply included a certificate of service with his Complaint stating that he mailed a copy of the Complaint to the parties and others (*see* ECF No. 1 at 16–17).

Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007); Saunders v. Duke, 766 F.3d 1262, 1272 (11th Cir. 2014); Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1369 (11th Cir. 1997) ("[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal . . . .").

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quotation and citation omitted). A claim is plausible on its face where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citation omitted). Plausibility means "more than a sheer possibility that a defendant has acted unlawfully." Id. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (quotation and citation omitted).

The determination of whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679 (citation omitted). The pleader

is not entitled to relief "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.* (citing Fed. R. Civ. P. 8(a)(2)). The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678 (quotation and citation omitted). And "bare assertions" that "amount to nothing more than a "formulaic recitation of the elements" of a claim "are conclusory and not entitled to be assumed true." *Id.* at 681 (quotation and citation omitted). Stated succinctly:

> Pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* at 679.

The same standard applies when the court screens complaints filed by prisoners and plaintiffs proceeding in forma pauperis. *See* 28 U.S.C. §§ 1915(e)(2)(B), 1915A. To survive dismissal at the screening phase, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Iqbal, 556 U.S. at 678 (internal quotation marks and citation omitted).

III.   WILDER'S FACTUAL ALLEGATIONS[3]

Wilder is diabetic (*see* ECF No. 1 at 6).  Prior to his arrest, his physician prescribed a 75/25 insulin mixture (Humalog) (*id.*).  Wilder was arrested and placed in the Jail on March 30, 2016.  *See* Wilder v. Simmons, Case No. 3:16cv241/MCR/EMT, Complaint at 7; ECF No. 1 (N.D. Fla. May 31, 2016).  Wilder was awakened at 3:00 a.m. to have his blood sugar tested.  *Id.*, Complaint at 7.  Wilder refused to have his blood sugar tested, so medical staff moved him to the infirmary.  *Id.*  Wilder was eating the cakes and cookies that the food service department included on his food tray, so the medical staff restricted Wilder's commissary privileges.  *Id.*, Complaint at 9.  The medical staff monitored Wilder's blood sugar levels twice daily.  *Id.*  On April 19, 2016, after Wilder's blood sugar readings had been over 500 for four days, a nurse asked Wilder to take metformin, which ARNP Burgess had ordered to treat Wilder's diabetes.  *Id.*, Complaint at 8.  Wilder refused, stating that he had previously taken metformin but it "keeps my stomach tore up."  *Id.*  On April 20, 2016, ARNP Burgess tried to convince Wilder to take a 70/30 insulin mixture

_____

[3] In addition to the factual allegations of Wilder's Complaint and Response to Defendant Burgess' motion to dismiss (ECF Nos. 1, 15), the court takes judicial notice of the facts alleged by Wilder in a civil rights complaint he filed in this court in May of 2016. *See* Wilder v. Simmons, Case No. 3:16cv241/MCR/EMT, Complaint at 7; ECF No. 1 (N.D. Fla. May 31, 2016). Wilder signed the complaint in that case upon declaring, under penalty of perjury, that the statements of fact included therein were true and correct. *Id.* at 14.

(NovoLog/Humulin). *Id.*, Complaint at 9. Wilder refused and told Burgess that he had

taken that insulin mixture before, and it caused him to be hospitalized for seven days.

*Id.* ARNP Burgess then asked Wilder to take metformin. *Id.*, Complaint at 9–10.

Wilder refused and told Burgess that it "keeps my stomach tore up." *Id.*, Complaint

at 10. ARNP Burgess told Wilder that she was trying to order a 75/25 insulin mixture,

but the doctor would not order it because it was not in the budget (ECF No. 1 at 6).

*See* <u>Wilder</u>, Case No. 3:16cv241/MCR/EMT, Complaint at 10. On April 27, 2016, a

member of the medical staff convinced Wilder to take 10 units of the 70/30 insulin

mixture. *Id.*, Complaint at 10. A few hours later, Wilder "bottomed out" (i.e., suffered

an episode of hypoglycemia or low blood sugar). *Id.*, Complaint at 10–11. Wilder

was given milk and a sandwich. *Id.*, Complaint at 11. Wilder refused to take any

more of the 70/30 insulin mixture or the metformin. *Id.* On May 2, 2016, ARNP

Burgess asked Wilder why he was refusing to take the insulin and medication, and

Wilder responded that it was not the medication he was taking "on the streets," and it

made him sick. *Id.* On May 4, 2016, three nurses and a nurse practitioner told Wilder

that they were still trying to get the 75/25 insulin mixture for him from the pharmacy

that had filled Wilder's prescription when he was "on the street." *Id.* Later that day,

the nurse practitioner reported that they could not obtain Wilder's prescription from

his pharmacy. *Id.*, Complaint at 12. Wilder agreed to take 10 units of the 70/30 insulin

mixture.  *Id.*  A few hours later, Wilder "bottomed out," so he refused to take any more insulin.  *Id.*

On May 16, 2016, Dr. Smith from the Escambia Community Clinics ("ECC") ordered the 75/25 insulin mixture (ECF No. 1 at 6).[4]  The first day that Wilder took the 75/25 insulin mixture, he "bottomed out" (*id.*).  Wilder reported a medical emergency to a security officer, and the officer contacted the medical department, but a nurse responded that Wilder "would be alright" and did nothing more (*id.*).  Wilder refused to take any more of the 75/25 insulin, because he feared he would "bottom out and die" (*id.*).  Wilder was released from the Jail on July 5, 2016.  *See* Wilder v. Simmons, Case No. 3:16cv241/MCR/EMT, Returned Mail, ECF No. 6 (N.D. Fla. Aug. 11, 2016).

Wilder was re-incarcerated in December of 2016 (*see* ECF No. 1 at 7).  Upon his arrest on December 5, 2016, he was placed in the hospital because his blood sugar reading was 1700 (*id.*).  Wilder's treating physician prescribed a specific diet for Wilder's diabetes (*id.*).  Upon Wilder's return to the Jail on December 8, 2016, a Jail official advised the food service department that Wilder was prescribed a restricted diet, but Wilder's food trays still contained items he was not supposed to eat, such as

_____

[4] ECC is a not-for-profit community health center designated as a Federally Qualified Health Center by the Department of Health and Human Services, Health Resources and Services Administration.  It provides outpatient primary care services to the medically needy, uninsured, and underinsured citizens of Escambia and Santa Rosa Counties.

grits, cheese, cookies, and noodles (*id.* at 7–8). ARNP Burgess restricted Wilder's commissary privileges to prevent him from ordering certain items such as grits, cheese, cookies, and noodles (*id.*). In protest of the commissary restriction, Wilder refused insulin (*id.*). Dr. Smith saw Wilder on January 26, 2017, and changed the amount of 75/25 insulin to 10 units (*see* ECF No. 5 at 25). Dr. Smith also removed the commissary restrictions (ECF No. 1 at 7).

Wilder's blood sugar levels were high from January 27–31, 2017 (*see* ECF No. 5 at 25–26). On January 31, 2017, medical staff told Wilder that his blood sugar was 960, and they wanted to administer an IV (*id.* at 26). Wilder refused (*id.*). An hour later, Wilder was taken to the hospital against his will, because his blood sugar level was still 960 (*see* ECF No. 5 at 2, 26). Wilder refused treatment because he believed it was futile since the food service department was giving him white bread and either potatoes or noodles two or three times a day, with cookies, cake, and syrup (*id.* at 26). Wilder was returned to the Jail (*id.* at 2, 26). Wilder refused to permit medical staff to take his vital signs until the food service department changed his diet (*id.* at 26). Medical staff again took Wilder to the hospital the next day, on February 1, 2017 (ECF No. 5 at 2, 26; *see also* ECF No. 1 at 7). Wilder's blood sugar was reduced to 290, and Dr. Smith prescribed a no-carbohydrate diet (ECF No. 5 at 26; *see also* ECF No. 1 at 7). The security staff and nursing staff at the Jail complained to the food service

department that the meals for diabetic inmates must be changed to omit restricted items, but Defendant Hannah, the food service director/supervisor employed by Defendant Aramark, did not change Wilder's meals (ECF No. 1 at 7; ECF No. 5 at 26).

Wilder saw Dr. Smith on February 3, 2017 (*see* ECF No. 5 at 26).  Dr. Smith changed Wilder's metformin to 1000 milligrams three times daily, and prescribed 15 units of Lantus insulin (*id.*).  That day and the following two days, Wilder refused his insulin because the food service department did not change his meals and still offered food items that failed to comply with his prescribed diet (*id.* at 26–27).  On February 6, 2017, Wilder's commissary items were confiscated (*id.* at 27).  On February 7, 2017, Wilder told a Jail official that he would "do right" if his commissary items were returned; he was moved from the infirmary to a cell upstairs, and he received a job assignment (*id.*).  Wilder saw Dr. Smith on February 9, 2017 (*id.*).  Dr. Smith told Wilder that his commissary items would be returned in one week, and Wilder would be moved from the infirmary (*id.*).  Wilder was moved (*id.*).

On February 15, 2017, Wilder submitted a sick call request complaining of too much insulin (ECF No. 5 at 28).  The next day, on February 16, 2017, Dr. Smith lowered Wilder's insulin to 12 units, prescribed Glipizide twice daily, and removed the commissary restrictions (*id.*).  On February 17, Wilder inquired when he would get his

commissary items returned, and he was advised that ARNP Burgess stated he would get them in seven days, because Dr. Smith's orders were unclear (*id.*). In protest, Wilder refused the next scheduled blood sugar check and all medications (*id.*). On February 18, Wilder was moved back to the infirmary (*id.*). On February 19–21, 2017, Wilder refused "everything" until his commissary items were returned (*id.*). Wilder was told that Dr. Smith would be returning on February 23, at which time his orders would be clarified (*id.*). On February 22, a nurse informed Wilder that his commissary restrictions would be removed, he would be "cleared" to return to his work assignment, and he would be moved from the infirmary to a cell (*id.*). Wilder began taking his medications again (*id.* at 29–30). Wilder's commissary privileges were "cleared" on February 28, 2017 (ECF No. 15 at 21).

On March 13, 2017, Wilder submitted a sick call request stating that he wanted his insulin reduced by 2 units or the metformin stopped (*see* ECF No. 15 at 30; ECF No. 5 at 30). The sick call nurse denied Wilder's request (ECF No. 15 at 30). On March 15, 2017, Wilder again refused his medication and was moved to the medical department (*id.*). ARNP Burgess ordered that Wilder's commissary items be confiscated and his commissary privileges restricted (ECF No. 15 at 21). Wilder refused all of his medications and many blood sugar checks until April 3, 2017 (*see* ECF No. 5 at 30–33). Wilder admits that he refused to take his insulin "to get my

commissary restrictions off" (*see* ECF No. 1 at 10). On April 3, 2017, Wilder asked

ARNP Burgess to lower his dosage of insulin from 12 units to 10 units and to reduce

his metformin to one daily dose (ECF No. 1 at 10; ECF No. 5 at 33). In Wilder's

Complaint, he states Burgess refused his request until Dr. Smith authorized it (*see* ECF

No. 1 at 10), but in Wilder's motion for temporary relief and response to Burgess'

motion to dismiss, Wilder states that Burgess reduced his insulin by 2 units and took

him off all metformin (ECF No. 5 at 33; ECF No. 15 at 17). Wilder took two of his

medications (Glipizide and Lisinopril) on April 3 and 4, but apparently still refused

insulin (ECF No. 5 at 33–34). Wilder's metformin was re-started on April 5 (ECF No.

15 at 17). Wilder refused all medications again on April 8, and refused at least one of

his two daily blood sugar tests on April 9, 10, and 11 (*id.* at 35–36). On the date

Wilder filed the Complaint in this case, April 12, 2017, he was on his third week of

refusing insulin (ECF No. 1 at 10).

   In addition to Wilder's complaints that ARNP Burgess failed to adequately treat

his diabetes, Wilder claims that Burgess failed to adequately treat his urinary problem.

Wilder states that on May 9, 2016, he submitted a sick call request complaining that he

was unable to urinate and had pain in his lower right side. *See* Wilder, Case No.

3:16cv241/MCR/EMT, Complaint at 12. Wilder advised that he had previously

suffered from kidney stones. *Id.* On May 13, 2016, ARNP Burgess prescribed Flomax

to assist him with urination. *Id.*, Complaint at 13. The next day, Wilder submitted another sick call request complaining that he "can't pee." *Id.* On May 16, 2016, Wilder received an x-ray of his kidneys (*see* ECF No. 1 at 6). *See* <u>Wilder</u>, Case No. 3:16cv241/MCR/EMT, Complaint at 12. Additionally, ARNP Burgess checked Wilder's prostate and determined it was swollen (*id.* at 6–7). Burgess provided medication (*see id.* at 7). Wilder was released from the Jail on July 5, 2016. *See* <u>Wilder</u>, Case No. 3:16cv241/MCR/EMT, Returned Mail, ECF No. 6 (N.D. Fla. Aug. 11, 2016).

Wilder states that since his re-incarceration in December of 2016, he has complained that he "can't pee" (ECF No. 1 at 7). ARNP Burgess issued Wilder the same medication she previously issued for Wilder's swollen prostate (*id.*). Wilder continued to complain, so Burgess doubled the dosage of medication (*id.*). On April 6, 2017, Wilder submitted a sick call request complaining that he "can't pee right" and that Burgess was simply "guessing" as to his medications (ECF No. 5 at 34). On April 13, 2017, after Wilder filed the Complaint in this case, another ARNP (ARNP Klee) examined Wilder's prostate (*see* ECF No. 5 at 36–37; ECF No. 15 at 12). In one of Wilder's submissions, he states the ARNP Klee noted that Wilder's prostate was slightly swollen and would be tested (ECF No. 5 at 37). In another submission, Wilder states Klee noted no swelling but ordered a test (ECF No. 15 at 12). On April 16, 2017,

Wilder again complained to a nurse that his prostate medication was not working (ECF No. 5 at 37). On April 27, 2017, Wilder submitted a sick call request complaining that he "can't pee" (*id.* at 39). Wilder states he still has to strain to urinate (ECF No. 15 at 13).

Wilder also complains that ARNP Burgess has failed to treat his neuropathy. Wilder alleges during his detention from March 30, 2016 to July 5, 2016, ARNP Burgess evaluated his feet and noted that Wilder had lost a lot of sensation in the front part of his feet (ECF No. 15 at 10). Wilder alleges ARNP Burgess prescribed medication to treat neuropathy (*id.*). Wilder alleges that when he was "on the street" from July to December of 2016, his physician prescribed medication for his neuropathy (ECF No. 1 at 9).

Wilder further alleges that on March 7, 2017, after he was re-incarcerated, he complained about swollen feet (ECF No. 5 at 29). On April 9, 2017 (just three days prior to commencing this lawsuit), Wilder submitted a sick call request complaining about his legs (*id.* at 35). Wilder alleges he submitted many sick call requests to the medical department requesting neuropathy medication (ECF No. 15 at 11). Wilder alleges ARNP Burgess was aware of one of those requests, and she told Wilder that the medical department did not have medication available to treat his problem (*id.*). Medication subsequently became available and was provided to Wilder, as evidenced

by the list of medications attached to Wilder's Response to Burgess' motion to dismiss, which states Wilder was prescribed 500 milligrams of Naproxen twice daily for "pain and inflammation" (ECF No. 15 at 39).

Wilder additionally complains that ARNP Burgess denied him dental care and pain medication for a broken tooth (ECF No. 1 at 8–9). Wilder alleges one of his teeth broke off at the gum line (*id.*). He alleges on March 28, 2017, an unidentified member of the medical staff examined his tooth (ECF No. 5 at 32). On April 3, 2017, Wilder submitted a sick call request complaining of a toothache (*id.* at 33). The same day, ARNP Burgess examined Wilder's tooth, took a picture of it, and provided ibuprofen for two days (ECF No. 5 at 33; ECF No. 15 at 8–9). Wilder states he again complained about his tooth on April 9, 2017, but he does not state to whom he complained (ECF No. 5 at 35). On April 27, 2017, after Wilder filed the Complaint in this case, Wilder submitted a sick call request complaining of a toothache (ECF No. 5 at 39–40). On April 30, 2017, Wilder again submitted a sick call request complaining of a toothache and requesting an appointment with a dentist (ECF No. 15 at 43). Wilder states a member of the medical staff examined his tooth, observed no obvious swelling, and characterized the condition as a non-emergency (*id.*). The medical department advised Wilder that the Jail did not have a dentist on staff (*id.*). Wilder states the medical department also told him that if his family made an appointment with a dentist,

the Jail would transport him (ECF No. 1 at 9–10). Wilder states he is homeless, poor, and has no family to do this (*id.*), but in his Response to Burgess' motion to dismiss, he referenced that his family sends him "I-care packages" (ECF No. 15 at 21).

## IV. DISCUSSION

### A. Medical Claims

#### 1. Defendant ARNP Burgess

Defendant ARNP Burgess contends the Complaint should be dismissed for failure to exhaust administrative remedies, because Wilder failed to allege he filed any administrative grievance regarding the allegations in his Complaint, or that he properly exhausted the administrative remedies available to him (ECF No. 12 at 5–6). Defendant Burgess additionally contends the Complaint fails to allege facts to state a plausible claim for relief under the Eighth and/or Fourteenth Amendment (*id.* at 6–17). Burgess contends Wilder also failed to satisfy the threshold requirements to pursue a medical negligence claim under Florida state law, to the extent Wilder asserts a state law claim (*id.* at 17).

In Wilder's Response to the motion to dismiss, he contends he was not required to plead exhaustion on the Complaint form (*see* ECF No. 15 at 19–20). He also argues he filed numerous grievances, but many were ignored, and prison officials eventually restricted him from filing grievances because he filed too many (*see id.* at 8–10, 12–13,

16–17, 19–24). Wilder submitted copies of administrative grievances he filed (*see* ECF No. 15 at 41–42, 44–51, 53, 55, 56–59, 60, 61, 62–64, 65–68, 69, 70–72, 73–74; *see also* ECF No. 5 at 15–23). Wilder contends he has demonstrated that his diabetes, urinary condition, tooth, and neuropathy are serious medical needs, and that ARNP Burgess has exhibited deliberate indifference with regard to treating those conditions.[5]

When brought by convicted prisoners, claims of deliberate indifference to serious medical needs proceed under the Cruel and Unusual Punishment Clause of the Eighth Amendment. *See* Gilmore v. Hodges, 738 F.3d 266, 271 (11th Cir. 2013). Pretrial detainees, however, must proceed under the Due Process Clause of the Fourteenth Amendment. *See* Dang by and through Dang v. Sheriff, Seminole Cnty. Fla., 856 F.3d 842, 849–50 (11th Cir. 2017) (citations omitted). Nevertheless, the minimum standard for providing medical care to a pretrial detainee is identical to the minimum standard required by the Eighth Amendment for a convicted prisoner, and thus the claim is analyzed under the decisional law of both Amendments. *Id.* at 850 (citation omitted).

Stating a claim of inadequate medical treatment requires satisfying two minima (from which the case law has ultimately derived four requirements). First, there must

---

[5] Although Wilder also references back pain in his Response to Burgess' motion to dismiss, Wilder's Complaint does not include a claim of deliberate indifference concerning his back.

be, objectively speaking, conduct by public officials "sufficiently serious" to constitute

a cruel or unusual deprivation—one "denying 'the minimal civilized measure of life's

necessities.'" Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271

(1991) (quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d

59 (1981)). Second, there must be a subjective intent by the public officials involved

to use the sufficiently serious deprivation in order to punish. *See* Wilson, 501 U.S. at

300 ("The source of the intent requirement is not the predilections of this Court, but

the Eighth Amendment itself, which bans only cruel and unusual *punishment*. If the

pain inflicted is not formally meted out *as punishment* by the statute or the sentencing

judge, some mental element must be attributed to the inflicting officer before it can

qualify." (emphasis in original)).

  In the context of denial of medical care, each of these minima has been more

specifically described as encompassing two subsidiary requirements. To show an

objectively serious deprivation, it is necessary to demonstrate, first, an objectively

"serious medical need[ ]," Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed.

2d 251 (1976), one that, if left unattended, "pos[es] a substantial risk of serious harm,"

Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). A

serious medical need is "one that has been diagnosed by a physician as mandating

treatment or one that is so obvious that even a lay person would easily recognize the

necessity for a doctor's attention." <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003). Second, it is necessary to demonstrate that the response made by the public official to that need was poor enough to constitute "an unnecessary and wanton infliction of pain," and not merely accidental inadequacy, "negligen[ce] in diagnosi[s] or treat[ment]," or even "[m]edical malpractice" actionable under state law, <u>Estelle</u>, 429 U.S. at 105–06.[6] Similarly, to show the required subjective intent to punish, a plaintiff must demonstrate that the public official acted with an attitude of "deliberate indifference," <u>Estelle</u>, 429 U.S. at 105, which is in turn defined as requiring two separate things: "aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists [ ] and . . . draw[ing of] the inference," <u>Farmer</u>, 511 U.S. at 837. Ultimately, there are thus four requirements: an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts. <em>See</em> <u>Taylor v. Adams</u>, 221 F.3d 1254, 1258 (11th Cir. 2000).

When analyzing an inmate's constitutional claim regarding medical treatment, the court must "distinguish between evidence of disputed facts and disputed matters

---

[6] A corollary to this requirement for a great deal more than negligence is that a public official who does act reasonably in response to a serious medical need "cannot be found liable under the Cruel and Unusual Punishments Clause," <u>Farmer</u>, 511 U.S. at 845, "even if the harm ultimately was not averted," <em>id.</em> at 844.

of professional judgment." <u>Beard v. Banks</u>, 548 U.S. 521, 530, 126 S. Ct. 2572, 165 L. Ed. 2d 697 (2006). A medical decision not to pursue a particular course of diagnosis or treatment is a classic example of a matter for medical judgment, an exercise of which does not represent cruel and unusual punishment. *See* <u>Estelle</u>, 429 U.S. at 107–08. Moreover, "[w]here a prisoner has received . . . medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in tort law." <u>Hamm v. Dekalb Cnty.</u>, 774 F.2d 1567, 1575 (11th Cir. 1985) (quotation omitted).

### a. Diabetes

There is no doubt that uncontrolled diabetes is a serious medical need; however, Wilder's factual allegations fail to show that ARNP Burgess' response to his diabetes was objectively insufficient. Indeed, Wilder's factual allegations demonstrate that ARNP Burgess consistently offered adequate treatment but Wilder refused some or all of that treatment. Wilder admits that upon his detention on March 30, 2016, he refused blood sugar tests. ARNP Burgess reasonably responded to Wilder's behavior by moving him to the infirmary. Burgess offered Wilder a 70/30 insulin mixture from March 30, 2016 to May 16, 2016, while the medical staff was attempting to obtain the 75/25 mixture that Wilder demanded. During that six-week period, Wilder agreed to

take only two doses of insulin (on April 27, 2016, and May 4, 2016). Wilder otherwise continued to refuse to take the insulin that was offered. Wilder contends his refusal was justified because he "bottomed out" after each of those two doses. But Wilder admits he also "bottomed out" on May 16, when he took the 75/25 insulin he had been demanding. Further, Wilder's factual allegations do not suggest that ARNP Burgess failed to reasonably respond when Wilder "bottomed out." Wilder admits that after the first incident, he received food to stabilize his blood sugar. Although Wilder alleges that "a nurse (name unknown)" failed to respond when he "bottomed out" after the dose of 75/25, this fact does not suggest deliberate indifference on the part of ARNP Burgess. Wilder's factual allegations fail to make a plausible showing that ARNP Burgess exhibited deliberate indifference with respect to Wilder's diabetes during his detention from March 30, 2016 to July 5, 2016.

The same is true of Wilder's deliberate indifference claim against ARNP Burgess concerning the period of his detention from December of 2016 to April 12, 2017, the date Wilder commenced this lawsuit. Wilder's factual allegations demonstrate that during that period, Wilder routinely refused medical treatment for his diabetes (including attempts to treat him at a hospital), as a means of protest (e.g., for Burgess' restricting his commissary privileges, and the food service department's continuing to put items on his food tray which were not compatible with his prescribed diet), and as

a means of getting what he wanted in relation to other aspects of his incarceration (e.g., housing and job assignments). Given this pattern, it was not unreasonable for ARNP Burgess to use commissary privileges as a "carrot and stick" to obtain Wilder's compliance with his diabetes medication regimen. Further, Wilder's factual allegations do not suggest that Burgess' restricting his commissary privileges posed a substantial risk of serious harm to Wilder's health, since Wilder admits he was ordering items incompatible with a diabetic diet (e.g., grits, cookies, and noodles).

Accepting Wilder's factual allegations as true, Wilder cannot state a plausible claim of deliberate indifference with respect to Defendant ARNP Burgess' treatment of his diabetes during his current or prior period of incarceration. Therefore, Defendant Burgess' motion to dismiss should be granted as to this claim. *See, e.g.*, Lynch v. Jackson, 478 F. App'x 613, 618 (11th Cir. 2012) (unpublished but recognized for persuasive authority) (affirming district court's grant of defendant doctors' motion to dismiss detainee's Eighth Amendment claim of deliberate indifference, where detainee was offered adequate treatment and refused it).

b.     Urinary problem

Wilder also failed to state a plausible claim of deliberate indifference with respect to his complaint of urinary problems. Wilder's non-conclusory factual allegations show that he complained of difficulty urinating, pain in his lower right side,

and a history of kidney stones on May 9, 2016. Four days later (May 13), ARNP

Burgess prescribed Flomax. The next day (May 14), Wilder submitted another sick call

request complaining that he was unable to urinate. Two days later (May 16) he

received an x-ray of his kidneys. Additionally, ARNP Burgess checked Wilder's

prostate, determined it was swollen, and provided medication. Wilder does not allege

he had any further complaints during that period of detention, which ended on July 5,

2016. These facts do not remotely suggest deliberate indifference on Burgess' part.

When Wilder was re-incarcerated in December of 2016, and again complained

that he "can't pee," ARNP Burgess provided the same medication she had provided

during Wilder's previous detention. This was a reasonable response, since Wilder

does not allege facts suggesting that Burgess was aware that the previous course of

treatment was ineffective. Then, when Wilder complained that the treatment was not

working, Burgess responded by increasing the dosage. Just prior to commencing this

lawsuit, Wilder complained that this different course of treatment was not working,

and one week later, he received a prostate exam and was told he would receive

additional testing. Additionally, according to a medical record submitted by Wilder to

the court on June 14, 2017, Wilder denied any bladder problems during his

appointment with Dr. Jerry Suelflow on June 5, 2017 (*see* ECF No. 20).

Wilder's factual allegations do not suggest a plausible claim of deliberate indifference on the part of ARNP Burgess with respect to treatment of Wilder's urinary problem. Therefore, Defendant Burgess' motion to dismiss should be granted as to this claim.

c.  Neuropathy

In Wilder's Complaint, Wilder alleges that when he was "on the street," his doctor prescribed medication for neuropathy (ECF No. 1 at 9). Wilder states ARNP refused to treat the numbness as his doctor did "on the streets," even though Burgess poked his feet to determine whether he had feeling in them (*id.*). After ARNP Burgess filed her motion to dismiss—arguing that her performing a physical examination to gauge the level of Wilder's neuropathy, or if he even had this condition at all, did not suggest deliberate indifference (*see* ECF No. 12 at 15)— Wilder modified his allegations in his Response to state that ARNP Burgess' evaluation of the level of feeling in his feet occurred between March and June of 2016 (*see* ECF No. 15 at 10–11). Wilder stated that at the time, Burgess commented that he had lost a lot of feeling in the front part of his feet, and she prescribed medication for neuropathy (*id.* at 10–11). Wilder stated that during his re-incarceration in December of 2016, he wrote many sick call requests to the medical department requesting that he be

prescribed neuropathy medication (*id.* at 11). Wilder stated ARNP Burgess informed him "We have no medication for this problem." (*id.*).

Wilder provides the following specific allegations regarding his sick call requests for treatment of neuropathy during his re-incarceration. On January 16, 2017, Wilder submitted a sick call request for "my feet and leg medication" (ECF No. 5 at 24). On January 17, 2017, Wilder submitted a sick call request for an extra blanket or pillow to elevate his feet because they were swollen (*id.* at 25). On January 19, 2017, Wilder submitted a sick call request regarding his feet (*id.*). Wilder saw Dr. Smith on January 26, 2017, but Wilder does not allege he mentioned any problems with his feet to Dr. Smith. On February 8, 2017, Wilder complained to Nurse Robinson that his toes were turning black (*id.* at 27). On February 9, 2017, Wilder submitted a sick call request to Nurse Robinson regarding his toes being black (*id.*). Wilder saw Dr. Smith that day, but again, Wilder does not allege he mentioned any problems with his feet. Wilder saw Dr. Smith again on February 16, 2017, and Dr. Smith issued Wilder a medical pass for an extra blanket (*id.* at 28). On March 7, 2017, Wilder complained that his feet were swollen (*id.* at 29). On April 9, 2017, Wilder submitted a sick call request concerning his legs (*id.* at 35). On April 11, 2017, Wilder submitted a request for a walker (*id.* at 36). On April 13, 2017, Wilder discussed his request for a walker with a member of the medical staff who was evaluating Wilder's prostate, and the staff

member told Wilder he would get back to him later that day (*id.* at 36–37). On April 19, 2017, Wilder submitted a sick call request for a walker (*id.* at 38). The same day, ARNP Klee told Wilder he "would see" about the walker, but Wilder states Klee did not address his leg cramps (*id.*). On April 27, 2017, Wilder submitted a sick call request to Nurse Robinson regarding his legs (*id.* at 39). On April 30, 2017, Wilder submitted a sick call request for an extra mattress and walker for his back (*id.* at 40). On that day, Wilder also filed a grievance complaining that he was being denied medical attention for "tooth ache, neuropathy, eyes, back, leg cramps, and can't pee right" (*id.*). Wilder subsequently received a prescription for Naproxen (500 milligrams twice a day), which is an anti-inflammatory medication used to treat inflammation as well as pain (ECF No. 15 at 39).

Wilder's allegation, that on a single occasion ARNP Burgess responded to his request for neuropathy medication by stating that the medical department had no medication for that problem, does not suggest that Burgess was subjectively aware of facts signaling a need for neuropathy medication and an actual inference of required action from Wilder's request. In sum, Wilder's factual allegations do not state a plausible claim of deliberate indifference against ARNP Burgess with respect to treatment of his neuropathy. Therefore, ARNP Burgess' motion to dismiss should be granted as to this claim.

Case No.: 3:17cv239/RV/EMT

d.    Broken tooth

The only factual allegations specific to ARNP Burgess with regard to Wilder's tooth are that Wilder submitted a sick call request complaining of a toothache on April 3, 2017, and the same day, ARNP Burgess examined Wilder's tooth, took a picture of it, and provided ibuprofen for two days (ECF No. 5 at 33; ECF No. 15 at 8–9). Although Wilder alleges he submitted other sick call requests complaining of a toothache, and he reports that the medical staff failed to provide treatment, Wilder does not allege facts that show a basis for holding ARNP Burgess liable for the conduct of other members of the medical staff.

Wilder's factual allegations do not suggest a plausible claim of deliberate indifference with respect to ARNP Burgess' response to Wilder's complaint of a broken tooth.   Therefore, Burgess' motion to dismiss should be granted as to this claim.

To summarize, accepting the truth of Wilder's non-conclusory factual allegations included in his submissions to the court, Wilder cannot state a plausible Fourteenth Amendment claim against ARNP Burgess for allegedly failing to provide adequate medical care.[7]   Therefore, Defendant Burgess' motion to dismiss should be granted,

---

[7] In light of this conclusion, the court need not address ARNP Burgess' exhaustion defense.

Case No.:  3:17cv239/RV/EMT

and Wilder's claims against Burgess dismissed with prejudice, pursuant to Rule 12(b)(6).

### 2.    Defendants Hannah and Aramark

Wilder alleges Defendant Aramark provides food service operations at the Jail, and employs Defendant J. Hannah, who is the supervisor/director of food service at the Jail (ECF No. 1 at 1, 2).  Wilder alleges Defendant Hannah has consistently provided him a food tray containing items which do not comply with the diet prescribed by Wilder's doctor, despite Hannah's being notified by medical staff, prison officials, and Wilder that the prescribed diet is necessary to control Wilder's diabetes (*id.* at 7–8).  As previously noted, neither Aramark nor Mr. Hannah have been served with process, and neither Defendant has filed a response or a Rule 12 motion.  The court will screen Wilder's claims against these Defendants under § 1915(e)(2)(B).

Where an inmate's § 1983 claim is based upon the deprivation of food, such a claim can only violate the Constitution if the prisoner is denied the "minimal civilized measure of life's necessities."  Wilson, 501 U.S. at 303.  "A well-balanced meal, containing sufficient nutritional value to preserve health, is all that is required." Smith v. Sullivan, 553 F.2d 373, 380 (5th Cir. 1977)[8]; *see also* Hamm, 774 F.2d at 1575 ("The

---

[8] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit Court of Appeals issued before the close of business on September 30, 1981.

fact that the food occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation."). The denial of a medically prescribed diet may violate the Constitution under certain circumstances. *See* McDonald v. Hardy, 821 F.3d 882, 890 (7th Cir. 2016); Lopez v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000); Robles v. Coughlin, 725 F.2d 12, 15–16 (2d Cir. 1983); Byrd v. Wilson, 701 F.2d 592, 594–95 (6th Cir. 1983); *see also, e.g.*, Marquez v. Woody, 440 F. App'x 318, 324 (5th Cir. 2011) (unpublished); Ayers v. Uphoff, 1 F. App'x 851, 855 (10th Cir. 2001) (unpublished). However, the failure to offer a special meal tray does not violate the Constitution if the inmate's medical needs are otherwise accommodated, for example, by teaching the inmate how to select foods from the regular food tray to meet prescribed dietary needs. *See* Startz v. Cullen, 468 F.2d 560, 561–62 (2d Cir. 1972); *see also, e.g.*, Mullins v. Cranston, 205 F.3d 1341, 1999 WL 1206930, at *2 (6th Cir. 1999) (unpublished).

"Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy . . . officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). And "although the touchstone of the § 1983 action against a government body is an allegation that official policy is

responsible for a deprivation of rights protected by the Constitution," municipalities also "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval." *Id.* at 690–91. A private entity, like Aramark, is subject to liability under section 1983 when it "performs a function traditionally within the exclusive prerogative of the state," such as contracting with the county to provide food services to inmates, because it becomes "the functional equivalent of the municipality" under section 1983 when it performs such a function.  Craig v. Floyd Cnty., Ga., 643 F.3d 1306, 1310 (11th Cir. 2011) (alterations and quotation marks omitted).

A municipality, or functional equivalent thereof, is not liable under section 1983 for injuries caused solely by its employees, McDowell, 392 F.3d at 1289, and may be held liable only when the execution of a government policy or custom causes the injury. City of Canton v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989).  There are several different ways of establishing municipal liability under § 1983. A municipality can be liable for an official policy enacted by its legislative body (e.g., an ordinance or resolution passed by a city council).  *See* Monell, 436 U.S. at 661, 694–95; McCusik v. City of Melbourne, 96 F.3d 478, 483 (11th Cir. 1996). Municipal liability may also attach if final policymakers have acquiesced in a longstanding practice that constitutes the entity's standard operating procedure.  *See*

Bd. of Cnty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 403–04, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997); Brown v. City of Ft. Lauderdale, 923 F.2d 1474, 1481 n.11 (11th Cir. 1991). And a municipality can be held liable "on the basis of ratification when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority." Matthews v. Columbia Cnty., 294 F.3d 1294, 1297 (11th Cir. 2002). So not all theories of municipal liability under § 1983 require (or depend on) a single final policymaker. *See* Hoefling v. City of Miami, 811 F.3d 1271, 1280 (11th Cir. 2016).

Here, Wilder does not allege any facts suggesting that Aramark has a policy of refusing to provide meals that comply with medically prescribed diets, that Aramark's final policymakers have acquiesced in a longstanding practice of refusing to provide such meals, or that someone with final decision making authority at Aramark adopted Defendant Hannah's decision to refuse to provide meals that complied with Wilder's medically prescribed diet. Because Wilder failed to allege any facts suggesting a plausible basis for holding Aramark liable for the conduct of Defendant Hannah, Wilder's constitutional claim against Aramark is subject to dismissal. *See* Cameron v. Thornburgh, 983 F.2d 253 (D.C. Cir. 1993) (prisoner's complaint failed to state claim against Attorney General and Director of Federal Bureau of Prisons for failure to provide medically prescribed low-sodium diet, where complaint did not allege that

Attorney General and Director participated in any decision or approve any policy relating to case).

However, since Wilder has the right to amend his Complaint as a matter of course against Defendants Aramark and Hannah, *see* Fed. R. Civ. P. 15(a)(1),[9] his claim against Aramark should be dismissed without prejudice to his filing an amended complaint.

B.   Remaining Constitutional Claims

Wilder claims that Defendants' failure to provide proper medical care violated his equal protection rights under the Fourteenth Amendment and his rights under the Fourth, Sixth, and Eighth Amendments (ECF No. 1 at 12).

The Equal Protection Clause of the Fourteenth Amendment requires the government to treat similarly situated people alike. *See* City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). To state a claim under the Equal Protection Clause, an inmate generally must allege "that (1) he is similarly situated with other prisoners who received more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally protected interest such as race." Jones v. Ray, 279 F.3d 944, 946–47 (11th Cir. 2001) (internal quotations

---

[9] Neither Aramark nor Mr. Hannah has been served, nor has either of these Defendants filed a responsive pleading or motion under Rule 12(b),(e) or (f) (unlike Defendant Burgess, who filed a Rule 12(b)(6) motion).

Case No.:  3:17cv239/RV/EMT

omitted). Thus, in order to assert a viable equal protection claim, a plaintiff must first make a threshold showing that he was treated differently from others who were similarly situated to him. *See* <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 112 S. Ct. 2326, 2331, 120 L. Ed. 2d 1 (1992); <u>Hendking v. Smith</u>, 781 F.2d 850 (11th Cir. 1986). The plaintiff must also allege that the defendant acted with the intent to discriminate against him. *See* <u>McClesky v. Kemp</u>, 481 U.S. 279, 292, 107 S. Ct. 1756, 1767, 95 L. Ed. 2d 262 (1987); <u>E & T Realty v. Strickland</u>, 830 F.2d 1107, 1113 (11th Cir. 1987). Conclusory allegations or assertions of personal belief of disparate treatment or discriminatory intent are insufficient. <u>GJR Inv., Inc. v. Cnty. of Escambia, Fla.</u>, 132 F.3d 1359, 1367–68 (11th Cir. 1998); <u>Coon v. Ga. Pac. Corp.</u>, 829 F.2d 1563, 1569 (11th Cir. 1987). The Equal Protection Clause is also implicated in "class of one" claims. <u>Campbell v. Rainbow City, Ala.</u>, 434 F.3d 1306, 1314 (11th Cir. 2006). A "class of one" equal protection claim does not allege discrimination against a protected class, but rather it alleges that the plaintiff "'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" <u>Griffin Indus. v. Irvin</u>, 496 F.3d 1189, 1202 (11th Cir. 2007) (quoting <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000)). The same strict "similarly situated" standard applies whether an equal protection claim is brought under a "class of one" theory or a traditional theory of

unlawful discrimination. *Id.* at 1204–05. Indeed, the "similarly situated" requirement must be rigorously applied in the context of "class of one" claims. *See* <u>Leib v. Hillsborough Cnty. Pub. Transp. Comm'n</u>, 558 F.3d 1301, 1306 (11th Cir. 2009).

Wilder does not allege he is similarly situated with other pre-trial detainees who received more favorable treatment than he. Although he complains that he was denied the privilege of receiving "I-care packages" from his family, but other diabetic inmates were allowed to receive them, Wilder does not allege that the other inmates were non-compliant with their diabetes medication regimens as he was. Furthermore, with respect to a traditional equal protection claim, Wilder fails to allege that the allegedly discriminatory treatment was based on a constitutionally protected interest, such as race. Wilder's allegations therefore fail to state a plausible equal protection claim.

With regard to Wilder's claims under the Fourth, Sixth, and Eighth Amendments, since his claims of inadequate medical treatment are properly brought under the Fourteenth Amendment, they are not cognizable under these additional Amendments.

C.  <u>Wilder's "Emergency Temporary Injunction"</u>

Two weeks after Wilder commenced this lawsuit, he filed a motion requesting transfer to another detention facility (ECF No. 5). Wilder bases his request upon claims that ARNP Burgess was not providing adequate medical treatment for his

various medical conditions, and Wilder was not being provided meals that complied with his medically prescribed diet (*id.*).

Plaintiff's motion is construed as one for a preliminary injunction or temporary restraining order. The purpose of preliminary injunctive relief is to preserve the status quo between the parties and to prevent irreparable injury until the merits of the lawsuit itself can be reviewed. *See* <u>Devose v. Herrington</u>, 42 F.3d 470, 471 (8th Cir. 1994). The grant or denial of preliminary injunctive relief rests in the discretion of the district court. *See* <u>Carillon Imp., Ltd. v. Frank Pesce Intern. Grp. Ltd.</u>, 112 F.3d 1125, 1126 (11th Cir. 1997) (citation omitted). The district court, however, must exercise its discretion in light of whether:

1. There is a substantial likelihood that Plaintiff will prevail on the merits;

2. There exists a substantial threat that Plaintiff will suffer irreparable injury if the injunction is not granted;

3. The threatened injury to Plaintiff outweighs the threatened harm an injunction will do to the Defendant(s); and

4. The granting of the preliminary injunction will not disserve the public interest.

*See* <u>CBS Broad., Inc. v. Echostar Communc'n Corp.</u>, 265 F.3d 1193, 1200 (11th Cir. 2001) (citation omitted); <u>Carillon Imp., Ltd.</u>, 112 F.3d at 1126. "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant

clearly establishes the 'burden of persuasion' as to the four requisites." <u>CBS Broad., Inc.</u>, 265 F.3d at 1200 (citation omitted). Because the purpose of preliminary injunctive relief is to preserve the status quo between the parties and to prevent irreparable injury until the merits of the lawsuit itself can be reviewed, the relief sought in the motion must be closely related to the conduct complained of in the actual complaint. <u>Devose</u>, 42 F.3d at 471; <u>Penn v. San Juan Hosp.</u>, 528 F.2d 1181, 1185 (10th Cir. 1975). Also, the persons from whom the injunctive relief is sought must be parties to the underlying action. *See* <u>In re Infant Formula Antitrust Litig., MDL 878 v. Abbott Lab.</u>, 72 F.3d 842, 842–43 (11th Cir. 1995).

With regard to ARNP Burgess' alleged failure to provide medical treatment, for the reasons discussed *supra*, Wilder cannot state a plausible claim for relief against Burgess. Therefore, there is no basis for granting Wilder's request for injunctive relief as it relates to ARNP Burgess' provision of medical treatment. Additionally, by requesting transfer to another facility, Wilder is seeking injunctive relief against a person or entity who is not a party to this civil rights action. None of the named Defendants, Aramark, Mr. Hannah, or ARNP Burgess, has authority to move Wilder to another detention facility. Therefore, Wilder's "Emergency Temporary Injunction" should be denied.

Accordingly, it is respectfully **RECOMMENDED**:

Case No.: 3:17cv239/RV/EMT

1.     That Defendant Burgess' motion to dismiss (ECF No. 12) be **GRANTED**, that Plaintiff's claims against Defendant Burgess be **DISMISSED with prejudice** for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6), and that Defendant Burgess be terminated from this case;

2.     That Plaintiff's Fourteenth Amendment equal protection claim and his Fourth, Sixth, and Eighth Amendment claims against Defendants Aramark and Hannah be **DISMISSED with prejudice** for failure to state a claim upon which relief may be granted, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii);

3.     That Plaintiff's Fourteenth Amendment due process claim against Defendant Aramark be **DISMISSED** for failure to state a claim upon which relief may be granted, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), **without prejudice** to Plaintiff's filing an amended complaint;

4.     That Plaintiff's "Emergency Temporary Injunction" (ECF No. 5) be **DENIED**; and

5.     That this case be remanded to the undersigned for further proceedings, including issuance of an order establishing a deadline for Plaintiff to file an amended complaint asserting Fourteenth Amendment due process claims against Defendants Aramark and Mr. Hannah based upon their alleged failure to provide medically prescribed meals.

Case No.:  3:17cv239/RV/EMT

At Pensacola, Florida this 9<u>th</u> day of August 2017.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**